IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| LAURA ANN GREEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 6:13-CV-31 |
| ) | |
| CAROLYN W. COLVIN, ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Laura Ann Green ("Green") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Specifically, Green argues that the ALJ failed to consider the cumulative effect of her impairments, improperly discounted her credibility and erroneously determined that her asthma was not a severe impairment. I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I **RECOMMEND DENYING** Green's Motion for Summary Judgment (Dkt. No. 13), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 15.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Green failed to demonstrate that she was disabled under the Act.[1] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

---
[1] The Act deems a person disabled for SSI purposes "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## **CLAIM HISTORY**

Green filed for SSI on October 9, 2007, claiming that her disability began on October 1, 2007.[2] Administrative Record ("R.") 14, 280. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 125–29, 133–38. Two hearings were held regarding Green's claim. After the first hearing on October 16, 2009 (R. 57–83), ALJ Thomas King entered a decision denying the claim on November 19, 2009. R. 87–104. Green requested review and the Appeals Council vacated the ALJ's decision and remanded the case to: (1) give further consideration to Green's residual functional capacity ("RFC"), and provide an appropriate rationale with references to record evidence to support it; and (2) obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Green's occupational base. R. 105–109.

On remand, ALJ Marc Mates held a hearing on January 5, 2012 to consider Green's claim. R. 33–46. Green was represented by an attorney at the hearing, which included testimony

---

death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. § 1382c(a)(3)(B).

[2] The administrative record contains several other applications for benefits that Green previously filed, including a March 9, 2006 application for both SSI and Disability Insurance Benefits with an alleged onset date of January 1, 2002 (R. 238- 248) and a November 13, 2007 application for SSI alleging an onset date of October 1, 2007. R. 249-256. The ALJ identifies October 9, 2007 as the filing date, however, and neither party disputes that finding. See Dkt. No. 16 at 3 (defendant's brief stating October 9, 2007 is filing date); Dkt. No. 14 (plaintiff's brief not containing a filing date).

2

from Green and vocational expert Robert W. Jackson. R. 31–46.

On January 13, 2012, the ALJ entered his decision analyzing Green's claim under the familiar five-step process[3] and denying her claim for benefits. R. 14–25. The ALJ found that Green suffered from the severe impairments of back difficulty, adjustment disorder, and borderline intellectual functioning. R. 16. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 17–18. Green was born in September 1969, was a younger individual as of her alleged onset date, 20 C.F.R. § 416.963(c), and has an eleventh grade education. R. 23, 35. Green previously worked cleaning the dining area at a fast food restaurant, which was light, unskilled work. R. 43. The ALJ found Green retained the RFC to perform light work, but was limited to simple, repetitive tasks. R. 19. The ALJ determined that Green did not have past relevant past work (R. 23), but that she could work at jobs that exist in significant numbers in the national economy, such as cleaner, packer, and mail clerk. R. 24. Thus, the ALJ concluded that Green was not disabled. R. 24. On April 25, 2013, the Appeals Council denied Green's request for review (R. 1–6), and this appeal followed.

## ANALYSIS

Green challenges the ALJ's decision on three grounds: (1) the ALJ failed to consider the cumulative effect of all of her impairments; (2) the ALJ erred by finding that Green was not fully credible; and (3) the ALJ improperly determined that Green's asthma was not a severe

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

3

impairment. I find that substantial evidence supports the ALJ's decision on each of these grounds, and recommend affirming the final decision of the Commissioner.

### Cumulative Effects of All Impairments

Green does not have a single disabling medical condition. Instead, she alleges that she has a number of different problems and that the cumulative effect of these problems renders her disabled. Green further alleges that the ALJ incorrectly relied on two reports from consultative examiners from 2008 finding her not disabled, and failed to adequately evaluate how Green's subsequent treatment undermines those reports.

Green does not point to any evidence that the ALJ failed to consider, identify evidence the ALJ relied upon outside the record or suggest that the ALJ used an improper legal standard to reach his decision. Rather, Green's argument amounts to nothing more than a request that this court re-weigh the evidence and reach a different decision – something this court will not do.

On October 20, 2007, Green reported to the Bedford Memorial Hospital emergency department ("the ER") complaining of abdominal pain and vomiting. R. 435–38.[4] She was diagnosed with a urinary tract infection and prescribed Lortab for pain. R. 437.

On November 29, 2007, Green returned to the ER complaining of bilateral hip pain with radiation into her right leg. R. 431. Although she described pain of 10 on a 1-to-10 scale, she exhibited full strength in both legs on examination and had only mild tenderness in her left and right paraspinous muscles L2 to L4. R. 432–43. Green was given differential diagnoses of lumbar sprain, sciatica, radiculopathy, and herniated disc, and prescribed a tapering dose of

---

[4] Many of Green's treatment records relate to treatment she sought for medical conditions that are neither the severe impairments identified by the ALJ, nor her asthma, which she claims is a severe impairment. For example, the records discuss various visits to an emergency room or free clinics for muscular pain, coughing, vomiting, therapy after a car accident, dizziness, chest pain, headaches, swollen feet, and a toothache. Because Green appears to be claiming that all (or many) of these impairments contribute to her disability, and because the ALJ discussed these visits and chronicled them in his opinion, R. 20–23, I discuss these treatment notes in my opinion.

4

Prednisone, acetaminophen, and hydrocodone. R. 432.

On December 6, 2007, Green visited the ER with complaints of chest pain, swollen hands, and left leg pain after riding in a car for an extended period of time without breaks. R. 413–15. A number of diagnostic tests were performed, but all results were basically normal. R. 420–430. She was diagnosed with musculoskeletal pain and prescribed Lortab. R. 419.

On June 2, 2008, Green reported to the ER with a history of swollen feet and was discovered to have pitting edema in both ankles. R. 674–75. She was diagnosed with fluid retention and a urinary tract infection. R. 675, 678. Two weeks later, Green returned to the ER with a history of toothache and swollen ankles. R. 686. No edema, swelling, or tenderness of her extremities was noted on exam, and she was advised to report to a dentist for assistance with her toothache. R. 688.

On November 6, 2008, Green visited the ER with complaints of left shoulder pain and arm pain that she rated as a 10 on a 1-to-10 scale. R. 695–96. She was diagnosed with a shoulder strain and prescribed naproxen sodium. R. 698.

On April 6, 2009, Green went to the ER complaining of diarrhea, mild abdominal pain, and chest pain. R. 734. On examination, she had no wheezing, rhonci, or accessory muscle use, although she did have decreased air movement right base. R. 735. Chest x-rays revealed right middle lobe ("RML") infiltrate, but they were otherwise normal, and Green was prescribed Keflex and Robitussin for pneumonia. R. 735–36.

On May 18, 2009, Green reported to the ER with right side pain. R. 756. A CT of her abdomen and pelvis revealed a small swollen lymph node and possible small kidney stone. R. 765. She was diagnosed with a urinary tract infection and abdominal pain and prescribed Cipro tablets.

5

On June 15, 2009, Green visited the ER, again complaining of left shoulder pain radiating into her hand that she rated as a 10 on a 1-to-10 scale. R. 776. Left shoulder x-rays were negative, R. 777, 781, and her shoulder had minimal tenderness, but no swelling or deformity. She was again diagnosed with shoulder sprain and prescribed naproxen sodium. R. 777–78.

Green reported to the ER with left shoulder and arm pain on November 15, 2009, rating her pain as 8 out of 10. R. 789. On exam, she had tenderness to palpitation over her left trapezius. R. 790. She was diagnosed with both cervical and shoulder strain and prescribed ibuprofen, flexeril, and ultram tablets for any pain not relieved by the ibuprofen. R. 790–91.

On November 27, 2009, law enforcement brought Green to the ER, after she reported that she wanted to kill herself. R. 799. She stated that she received bad news in the mail and that she wanted to stab herself. R. 799. She reported a prior suicide attempt in 1983 by cutting her wrist and stated that she was admitted to a psychiatric facility at that time. R. 799. On examination, she was cooperative, had clear speech, had a normal affect, and was oriented to person, time and place. R. 800. She had no physical complaints. R. 799–801. After an examination, the physician noted that he did not believe she was an imminent risk to herself or others and released her. R. 801.

On December 1, 2009, Green went to the ER complaining of right side pain. R. 818. After lab work, she was diagnosed with acute pyelonephritis (a condition related to her kidney) and prescribed Tylenol and Keflex, as well as Toradol for pain. R. 822.

On March 21, 2010, Green visited the ER complaining of left facial, neck, and shoulder numbness and pain. R. 833. She had tenderness at the left rotator cuff upon examination, but had full strength in her extremities and full range of motion. She had a normal lung examination with no wheezing, rales, or rhonci. R. 834. She was diagnosed with a rotator cuff sprain in her

6

shoulder and prescribed Ultram. R. 835.

Green visited the ER on September 6, 2010, with complaints of being dizzy and seeking placement in a room. She ambulated from the hospital without difficulty. R. 842.

Green's last ER visit in the record occurred on December 29, 2010, when she reported with complaints of a headache and congestion, but no accompanying fever. R. 849. She did not report any respiratory symptoms and she was "not experiencing shortness of breath." R. 862. She was diagnosed with acute sinusitis and prescribed antibiotics and codeine. R. 864.

Green also sought treatment with the Bedford Christian Free Clinic during the relevant period. On January 30, 2009, she reported complaints of lesions on her left ear and chest and was prescribed an antibiotic ointment. R. 583. She was also referred for lab work to check her thyroid level. R. 583. At a February 4, 2009 follow-up visit, Green's TSH level was elevated and she was prescribed Synthroid to help stabilize her thyroid. R. 584. A month later, on March 5, 2009, her TSH level was normal. R. 574.

On April 15, 2009, nine days after she was diagnosed with pneumonia in the hospital, Green followed-up at the Bedford Clinic. Again, her diagnosis of hypothyroidism was noted, as well as "pneumonia by history." R. 585.

On two separate visits dated July 15, 2009 and September 2, 2009, Green exhibited a slight wheeze on examination. R. 586–87. She was diagnosed with asthma and prescribed Albuterol and Advair. R. 586–87. She went for a follow-up appointment to get a refill of medication on October 7, 2009. R. 592. On March 22, 2010, Green stated that she was stable and felt well on the Synthroid but that she needed her inhaler on a daily basis. R. 591. On examination, her chest was clear and she had no wheeze. R. 591.

Green followed up with the Christian Ministries Free Clinic in April, July, and November

7

2011, to continue receiving her medications. R. 662, 664–65, 667.

Green received psychiatric treatment through Central Virginia Community Services ("CVCS") during the period of alleged disability. She first visited CVCS on February 8, 2010, and reported being depressed and having daily suicidal thoughts, occasional insomnia, and hallucinations. R. 607–13. She denied having a suicide plan and instead said she had only nonspecific suicidal thoughts. R. 614. Upon examination, her appearance, speech, mood, affect, thought content, attention, and concentration were all within normal limits. The exam revealed poor judgment, limited insight, and poor coping skills. R. 609. Her evaluator, Quinn Hall, M. Ed., QMHP,[5] determined that she would benefit from case management, medication management, and behavioral therapy. R. 613. Green was diagnosed with a mood disorder and agreed to a treatment plan that included visits for medication management every 90 days, monthly contact with her clinical supervisor, and re-evaluation every three months. R. 616–17.

Green returned for follow-up on May 5, 2010 (R. 605–06) and reported that she was 'too busy to have suicidal thoughts." R. 605. She also reported a decrease in her depressive symptoms since starting Cymbalta. R. 605–06. She was assessed as having a GAF[6] of 58 at that time. R. 605. On August 4, 2010, Green was again assessed with a GAF of 58 after she denied suicidal thoughts and reported being compliant with her medications. R. 603. No significant changes

---

[5] A QMHP is a Qualified Mental Health Professional.

[6] The GAF Scale is used by mental health professionals to rate overall functioning and considers the psychological, social, and occupational functioning of an individual on a hypothetical continuum of 1 to 100. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. Rev. 2000) (DSM IV), with 100 being the most high-functioning. The DSM IV defines GAF scores as follows: a score of 41–50 suggests serious symptoms or serious impairment in social or occupational functioning; a score of 51–60 suggests moderate symptoms or difficulty in social or occupational functioning; a score of 61–70 suggests mild symptoms or some difficulty in social, occupational, or school functioning. DSM IV. The GAF has been dropped from the Fifth Edition of the DSM, published in 2013, due in part to its "conceptual lack of clarity" and "questionable psychometrics in routine practice." DSM-5 at 16. Despite its shortcomings, the GAF was used by Green's providers during the relevant period of alleged disability and the ALJ discussed the scores. Thus, they are part of the medical evidence.

were noted from her prior assessment. R. 603.

On November 17, 2010, Green returned for another psychiatric examination. She was noted as being socially integrated, having appropriate thought content and affect, and having moderate insight. R. 644–45. She was described as stable and was told to continue taking her medications, including the antidepressant Cymbalta. R. 645–46. A psychological review done at the same time noted that she was stable, everything was normal, and no thoughts of suicide were reported. R. 627–30.

On February 15, 2011, Green reported some depression had returned, and she had stopped taking all medications in January 2011 for financial reasons. R. 641–42. She had a depressed mood and affect on examination, but was alert and oriented, had normal speech, and denied any suicidal or homicidal ideation. R. 641–43. She was prescribed the antidepressant Zoloft. R. 643.

At her next two psychiatric evaluations, on May 10, 2011 and August 30, 2011, Green reported that she felt "good" when she took her medications, and denied depression and any suicidal or homicidal ideation. R. 635, 637–38. On exam, she had a euthymic mood and full affect. R. 637, 640. On her last treatment record from CVCS, she reported "doing ok" on Zoloft, sleeping well, and having a "just fine" appetite. R. 632–34. She was "in good spirits" and again demonstrated an euthymic mood and denied suicidal or homicidal ideation. R. 634.

Green also received treatment from a chiropractor for complaints of neck and low back pain from April 2008 through June 2008 after she was involved in a car accident. R. 527–539. At the time she completed those treatments, she reported that she was still experiencing pain, but that the pain was "better." R. 530–34.

None of the treatment notes detailed above contain opinions of Green's work limitations.

9

Instead, the only evaluations in the record of Green's functional abilities were from two consultative examinations, one psychological and one physical, and from two state agency physicians who reviewed Green's records.

On February 13, 2008, E. Wayne Sloop, Ph.D., performed a psychological consultative examination of Green. Green reported that her only mental complaint was a history of a learning disorder, and she denied any history of psychotropic medication. R. 487, 489. Although Green admitted occasional thoughts of suicide, she was oriented, had good memory, normal concentration and attention, and logical, coherent, linear, and goal-directed thought process. R. 490. Dr. Sloop determined that she had fair judgment and poor insight. R. 490.

Green told Dr. Sloop that she cooks meals for her daughter and husband and that, two to three days a week, she babysits a 4-year old boy from about 2:30 p.m. until approximately 11:00 p.m. R. 488. She also reported that she washes clothes and dishes when able, and that she would occasionally sweep or vacuum, and that she does not do much more household cleaning or chores because of her back problems and problems with her hands. R. 488.

Dr. Sloop administered several intelligence tests, including the WAIS III which showed borderline intelligence. Dr. Sloop diagnosed Green with an adjustment disorder with anxiety and depressed mood, and borderline intellectual functioning. Dr. Sloop also made a provisional diagnosis that Green had a dependent personality disorder. R. 491. He assessed her current GAF as a 50–55 and noted that her prognosis was "guarded." R. 491. In explaining this prognosis, Dr. Sloop stated that Green "has a number of physical problems and her motivation for work appears to be low. She also seems to have more difficulty with depressed mood than she is willing to acknowledge." R. 491. In terms of her ability to function in a work environment, Dr. Sloop determined that Green is 'definitely able to perform simple and repetitive tasks," and that "[s]he

could possibly perform detailed and complex tasks but is likely to require repetition of instructions." R. 492. Dr. Sloop further found that despite Green's "array of physical problems," she "appears capable of maintaining regular attendance at work, performing work activities consistently, and performing work activities without special supervision." R. 492. Finally, he noted no findings that her psychological or emotional problems would prevent her from completing a work day or dealing with the usual stresses in competitive work. R. 492.

Christopher Newell, M.D. completed a medical consultative examination on March 7, 2008. R. 520–26. Green complained of a number of physical ailments, but Dr. Newell's only diagnosis was chronic daily headaches. R. 520, 523. Green told Dr. Newell that her carpal tunnel syndrome had improved and that, despite her history of hypothyroidism, she did not take any thyroid pills. R. 521. The physical examination revealed that Green had a normal gait and that her chest was clear with no rales, rhonci, or wheezes. R. 522. She had a mildly decreased range of motion of the neck, as well as tenderness of the neck and low back pain on palpitation, but found that her pain complaints were out of proportion to examination. R. 523. Dr. Newell further found that Green had a full range of motion of the dorsolumbar spine and bilateral shoulders, elbows, wrists, hands, fingers, hips, knees, and ankles, R. 526, and full strength and normal sensation in both her upper and lower extremities with no evidence of muscle atrophy. R. 522–23. Dr. Newell concluded that Green could lift and carry 20 pounds occasionally and 10 pounds frequently, and that she could stand and walk six to eight hours in an eight hour day, sit without limitation, and occasionally bend, stoop, and squat. R. 523–24.

Four state agency physicians offered opinions as to Green's functional limitations based on a review of her medical records. Richard Surrusco, M.D. reviewed Green's records on March 5, 2008, and concluded that she could perform medium work. R. 494–500. Shirish Shahane,

11

Case 6:13-cv-00031-NKM-RSB    Document 19    Filed 08/15/14    Page 11 of 20    Pageid#: 979

M.D. agreed with Dr. Surrusco after his review of Green's records on August 27, 2008. R. 564–70.

State agency psychologists E. Hugh Tenison, Ph.D., reviewed Green's records on March 5, 2008, and found that Green had no restrictions in her activities of daily living, was mildly limited in maintaining social functioning, moderately limited in maintaining concentration, persistence, or pace, and that she had had no episodes of decompensation. R. 501–19. Based on those findings, Dr. Tenison concluded that she was able to "manage the mental demands of many types of jobs not requiring complicated tasks and could perform the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments." R. 518. State agency psychologist Eugenie Hamilton, Ph.D., concurred with Dr. Tenison's conclusions after reviewing Green's records on August 27, 2008. R. 545–63.

Green contends that the ALJ failed to consider the cumulative effect of all of her impairments set forth in the medical records above. Where a claimant has multiple impairments, as Green does here, the ALJ must consider the combined effect of those impairments in determining whether the claimant is disabled. 20 C.F.R. § 416.923; Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). "It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render [a] claimant unable to engage in substantial gainful activity." Id. at 50. In addition to "not fragmentiz[ing]" the effect of the claimant's impairments, "the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Id. at 50 (citing Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir.1985)). "[A]n ALJ need not explicitly state that he or she has considered a claimant's impairments in combination. What matters is whether it is discernible from the ALJ's decision that he or she did so." Jones v. Astrue, 2011 WL 1877677, at

12

*12 (W.D. Va. May 17, 2011).

The ALJ identified that Green had several severe impairments—back difficulty, adjustment disorder, and borderline intellectual functioning. But the ALJ explicitly found that Green did not have an impairment or combination of impairments that met one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 17. The ALJ also expressly considered the fact that Green had a history of hypothyroidism, gastroesophageal reflux disease, and migraine headaches. R. 16. But he explained that

> there are no indications that, alone or in combination, these impairments have had more than a minimal effect on the claimant's functional capabilities for the twelve-month durational requirement of the regulations. The claimant testified that her migraine headaches were controlled with Ibuprofen. The record indicates that her hypothyroidism has been controlled with the use of appropriate medication. At the hearing, the claimant did not report any symptoms related to hypothyroidism or gastroesophageal reflux disease that would affect her ability to work.

R. 16.

Thus, the ALJ considered, in combination, the other impairments Green listed on her application, and his conclusion as to their severity is supported by substantial evidence. Green testified at the administrative hearing that her migraines had "slacked off" and that she took only ibuprofen for them. R. 37. Further, she stated no complaints during the administrative hearing regarding symptoms from either her hypothyroidism or gastroesophageal reflux disease, and the medical records do not reflect any limiting symptoms from either of these impairments.

The ALJ thoroughly considered all of the evidence relating to Green's alleged physical and mental impairments when developing an RFC and finding Green not disabled. He incorporated both exertional and nonexertional limitations in Green's RFC (R. 19) and his hypothetical questions to the vocational expert addressed all of these limitations. R. 43–45. It is

13

apparent from the RFC itself that the ALJ accounted for the cumulative impact of Green's impairments as supported in the record, providing restrictions that are both mental (e.g., limited to simple, repetitive tasks that involve little independent decision-making) and physical (e.g., limited to light work). R. 19. Green fails to state with any degree of precision how the restrictions provided for in the RFC neglect to address any combined impact of her mental and physical impairments, and there is no opinion in the record from any physician stating that Green is more functionally limited than the ALJ found in the RFC.

Substantial evidence also supports the ALJ's decision to give great weight to the consultative examiners' opinions, even though they were rendered several years prior to the administrative hearing. Green's medical conditions are either controlled with treatment, or are isolated instead of chronic in nature. Similarly, substantial evidence supports the ALJ's determination that Green's asthma is a non-severe impairment. Thus, none of these other alleged impairments of medical problems, even in combination, result in more limiting restrictions than those set forth in the RFC.

Green correctly points out that much of her treatment for depression occurred after the consultative exams. However, the treatment notes reflect that Green received only conservative treatment for that depression, and that she repeatedly stated that when she took her prescribed medicines, they controlled her symptoms, i.e., she felt "good" or "ok." See, e.g., R. 655 (denies feeling depressed); 650–51 ("doing ok with Zoloft" and "in good spirits"); R. 637 (describing her as smiling with a good sense of humor and stating, "If I take my meds, I stay feeling good."); R. 640 (describing her "bright facial expression" and "full affect"); R. 642 (she reported being "just fine"). Indeed, Green testified at the administrative hearing that she found her monthly meetings with her therapist helpful and that, since she's been on the Zoloft, she has no

14

"difficulties interacting with others" or "problems along those lines." R. 39–40. As the Fourth Circuit has noted, "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F. 2d 1163, 1166 (4th Cir. 1986) (citations omitted);

The treatment received for shoulder pain or rotator cuff pain—some of which occurred after the consultative examinations—was typically at the Bedford Memorial Emergency Department. The exams revealed no severely abnormal findings and usually resulted merely in a diagnosis of shoulder strain. Green received only conservative treatment and typically just received a medication prescription. R. 788–96, 775–85, 696–700. Many of Green's other treatment records related to complaints of a limited nature and duration, such as her treatment for a toothache, or abdominal pain, or urinary tract infections.

Green was diagnosed with asthma after the date of the consultative exams (on October 7, 2009). The record contains no medical evidence that Green's asthma caused any functional limitations in her ability to work. The medical records as a whole demonstrate that Green has occasional wheezing, but has successfully controlled these problems with inhalers. On several examinations both before and after her asthma diagnosis, physical examinations revealed no ill effects or symptoms from the asthma at all. R. 414, 432, 522, 759, 800, 834 (October 20, 2007, November 29, 2007, December 6, 2007, March 10, 2008, May 18, 2009, November 27, 2009 and March 21, 2010 visits all reflecting no wheezing, no rales, no rhonci, and good air exchange bilaterally); R. 591 (March 22, 2010 visit with note of no wheezes in chest). Indeed, even on her April 6, 2009 visit when she was diagnosed with pneumonia (which she claims was caused by her asthma), the x-ray revealed there was only RML infiltrate and her lung fields were otherwise clear. A physical examination showed "decreased air movement right base[,]" but no wheezing and no rhonchi. R. 735. Green was never referred to a pulmonary specialist, as one might expect

15

if severe problems existed or persisted.[8] Thus, substantial evidence supports the ALJ's determination that Green's asthma was a non-severe impairment that imposed no functional limitations.

In sum, the record reflects that the ALJ gave adequate consideration to all of her treatment records, all of the medical opinion evidence, and all of Green's possible impairments. I thus conclude that there is substantial evidence to support the ALJ's determination of Green's RFC.

## **Credibility**

Green challenges the ALJ's determination that she was not fully credible. It is the ALJ's duty, not this Court's, to determine the facts and resolve inconsistencies between a claimant's alleged impairments and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). In doing so, the ALJ must examine all of the evidence, including the objective medical record, and determine whether Green met her burden of proving that she suffers from an underlying impairment which is reasonably expected to produce her claimed symptoms. Craig v. Chater, 76 F.3d 585, 592–93 (4th Cir. 1996); see also 20 C.F.R. § 416.929(c) ("In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating or nontreating source, or other persons about how your symptoms affect you. We also consider the medical opinions of your treating source and other medical opinions as explained in § 416.927."). The ALJ then must evaluate the intensity and persistence of the claimed symptoms and their effect upon Green's ability to work. Craig, 76 F.3d at 594–95. The ALJ is not required to accept a claimant's allegations of her limitations, though, if they are inconsistent with the

---

[8] The jobs identified by the vocational expert that Green could perform do not involve exposure to fumes or other environmental conditions. See Dkt. No. 16 at 20–21 (citing DOT numbers of selected jobs the vocational expert said a person with Green's RFC could perform).

16

objective evidence of the underlying impairment, or with the extent to which the impairment can reasonably be expected to cause the pain alleged. Hines v. Barnhart, 453 F.3d 559, 565 & n.3 (4th Cir. 2006) (citing Craig, 76 F.3d at 595). A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.)

The ALJ pointed to four factors as supporting his finding that Green's complaints of the severity of her symptoms were not credible. First, he noted that her treatment was "relatively limited and conservative," because she had been treated primarily with medications, and those medications had been relatively effective. R. 21–22. Second, he found that repeated physical examinations as well as results of medical tests had failed to reveal evidence of significantly decreased strength, sensation, or range of motion, as would be expected with Green's described disabling pain. Third, he reviewed Green's work history—which has never been at a level constituting annual substantial gainful activity—and concluded that it "raises some question as to whether her unemployment is due to medical impairments." R. 22. Finally, he noted that the record contained no opinions from treating sources stating that the claimant is disabled or more limited than determined in the RFC. These grounds provide substantial evidence to support the ALJ's credibility determination.

As to the first two grounds, Green testified that she can only stand, sit, or walk for five to ten minutes at a time before needing to switch positions. R. 36, 38. She also testified that she can only lift five pounds at a time. R. 39; but see R. 290 (reporting, in December 2007, that she could lift ten pounds at a time). In December 2007, she claimed that pain made it difficult for her to

17

complete tasks, concentrate, and to understand and follow instructions. R. 290. She further reported that she can only walk 100 feet without needing to stop and rest. R. 290. She also repeatedly complained to providers of pain very high on a 1-to-10 scale. See, e.g., R. 431 (hip pain, 10/10); R. 413 (pain in chest and leg, 10/10); R. 528 (pain after her car accident of 8/10, "all day, every day"); R. 776 (shoulder pain, 10/10); R. 789 (shoulder pain, 8/10).

Additionally, Green's physical examinations and laboratory results did not support her complaints of disabling pain. Findings on exam and in x-rays or other tests were generally unremarkable, and Green was often diagnosed with minor problems or mild muscular strains and was treated conservatively, using pain medications such as ibuprofen or acetaminophen and hydrocodone.

Green's complaints of disabling pain were also contradicted by her own reports of her activities during the period of alleged disability. These activities included cooking light meals for herself, her husband and daughter, doing laundry, watching television, taking care of her pets, attending to her personal hygiene, occasionally going shopping for clothes and groceries, babysitting a four-year old from 2:30 p.m.–11:00 p.m. several days a week, and visiting her daughter and grandchildren. R. 40–41, 285–90, 488.

The ALJ also properly considered Green's limited work history as bearing on her credibility. R. 22. Several courts of appeals have noted that a claimant's limited work history may properly be considered when assessing her credibility. Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998) (noting that the SSA regulations allow the fact-finder to consider a claimant's prior work record when addressing credibility and holding that a poor work history is a factor the ALJ may consider); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (a prior work history of low earnings and significant breaks in employment was a factor the ALJ could consider when weighing the claimant's credibility). In this case, despite being nearly thirty-eight

18

years old at the time of her onset date, Green had worked only sporadically and for limited wages. The ALJ could consider this as some evidence that she was not precluded from working by her medical impairments.

Finally, the ALJ correctly noted that no provider offered any opinion suggesting that Green was disabled or more limited than he found in the RFC. The Court does not review the ALJ's decision de novo. The Court's role is limited to determining whether the Commissioner's decision is supported by substantial evidence. See Smith, 99 F.3d at 638 (the ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and her ability to work). In this case, substantial evidence supports the ALJ's opinion. The objective medical record simply fails to document the existence of any physical conditions which would reasonably be expected to result in total disability from all forms of substantial gainful employment.

### Determination that Asthma Was Non-Severe Impairment

I previously discussed Green's asthma in the context of considering the cumulative effect of her impairments. Green claims that her asthma clearly impacts her health and would affect her attendance, but she does not identify any functional limitations imposed by any medical source as a result of her asthma. For this reason, and for the reasons set forth above, I conclude that substantial evidence supports the ALJ's determination that her asthma was a non-severe impairment.

### CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United

States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

    Enter:  August 15, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge